[Crim. No. 2670.   Third Dist.   Dec. 27, 1956.]

THE PEOPLE, Respondent, v. WILLIE LLOYD CART-
WRIGHT, Appellant.

John L. Briscoe, Public Defender, for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

SCHOTTKY, J.—Willie Lloyd Cartwright was charged by information with the crime of murder.  He pleaded not guilty, waived a trial by jury and requested the court to try his case sitting without a jury.  At the conclusion of the trial the court found the defendant guilty of murder in the first degree.  Defendant's motion to modify the judgment from first degree to second degree was denied and judgment was

pronounced that defendant be imprisoned in the state prison for life.

Defendant has appealed from the judgment and from order denying his motion to modify the judgment. Appellant's sole contention is that the evidence is insufficient to support a finding of deliberation and premeditation and hence that the trial court's determination that the killing was murder in the first degree is erroneous, and therefore the judgment of conviction should be modified to fix the degree of the homicide as murder in the second degree. In view of this contention we shall summarize the evidence as shown by the record.

On the evening of August 25, 1955, the appellant shot and killed his estranged wife, Eula Bernice Cartwright. This tragedy climaxed several years of marital discord, which included two separations and two divorces. Soon after the interlocutory decree of divorce in 1953, the couple became reconciled until early in August of 1955 when, after a long period of disharmony concerning the late hours kept by the decedent the couple again separated and the decedent obtained another interlocutory decree of divorce on the 18th day of August, 1955.

On the day of the murder the defendant spent most of the afternoon and early evening hours drinking. At about 9:30 p. m. he telephoned his 12-year-old daughter, Mary Louise, at the home of his estranged wife. The conversation which ensued disturbed the defendant greatly. He asked the child whether she liked the man his wife was going out with and the reply was that the child preferred that man to the defendant. The defendant angrily informed the child that they would never have the man as a father. By the time the child hung up on him the defendant was in the state of tears. He thereupon went to his parents' home and got and loaded a rifle. From there he drove to Dick's Drive-In where his estranged wife was working as a car hop.

After being parked in the lot of the drive-in for about 15 minutes the defendant called Lena Byrd, another car hop, over to his car and told her he wanted to talk to his wife. Miss Byrd related this to the decedent and she came over to the defendant's car. After a brief conversation during which, according to the defendant's statement, his temper had cooled down he started to question the woman concerning her new boy friend. She informed him that it was none of his business, and seeing the rifle on the floor-boards of the car she whirled and started to run away. The defendant thereupon

grabbed the loaded rifle, jumped from the car and shot his wife in the back. He fired three initial shots and then pumped two more bullets into his wife's body as she lay on the ground a few feet away. She died as a result of the wounds thus received.

The defendant returned to his car and drove to the 21 Club where he had been earlier and informed James Pollanda, an employee of the bar, that he had just shot his wife. He took Pollanda out to the car and gave him the rifle. He asked Pollanda to "call the law" and offered no resistance.

Shortly after his arrest defendant made a free and voluntary statement concerning the events which had transpired. This statement was substantially in keeping with his testimony at the trial. He admitted that he had made threats concerning his wife and the other man during his telephone conversation with his daughter. He stated that he knew the rifle was a dangerous lethal weapon and that it was on the floor-boards of his car during his conversation with the decedent at the drive-in. In the statement he admitted that he had obtained the gun and taken it to the drive-in with the intention of killing his wife.

Defendant took the stand and testified to the events which had transpired in substantial conformity with the testimony of the prosecution witnesses. He stated that when he got the gun he didn't know whether he intended to shoot himself or his wife or the other man. He stated that at the drive-in his temper "cooled down" while he was talking to his wife, but then he "just went crazy."

Upon cross-examination defendant was confronted with his prior statement that he had in fact intended to kill his wife. He was asked, "Do you remember that answer, sir?" He responded, "I wouldn't—I wouldn't say I remembered it and I wouldn't say I wouldn't."

Geraldine Cartwright, the defendant's sister-in-law, was called as a defense witness and testified that the decedent had been going around with other men while married to the defendant. It was stipulated that a physician, if called, would testify to the fact that the decedent had been pregnant and had suffered a miscarriage in the spring of 1955. The defendant had been sterilized by surgery some two and a half years previously.

Dr. John A. Malloy, a licensed physician and surgeon specializing in psychiatry, was called by the defense. He

testified that he found the defendant to have been very emotionally disturbed, feeling depressed, lonely, nervous and very much upset for several weeks prior to the shooting. It was his opinion that at the time of the shooting the defendant was "very, very disturbed," and he had strong reason to suspect that the defendant had been severely ill mentally. He further testified that he was of the opinion that the defendant was not able to deliberate at the time of the shooting, if by the word "deliberate," thinking rationally and clearly is meant. Upon cross-examination the doctor testified that he had relied heavily upon the truth of the defendant's statements to him.

The prosecution called Lt. Esau of the Sheriff's Department who testified that the defendant, shortly after the crime, had admitted to him that an intent to kill his wife had been formed after the telephone call to his daughter.

Appellant contends most earnestly that the evidence in the instant case does not establish that the homicide committed by appellant was a willful and deliberate murder within the meaning of section 189 of the Penal Code, which reads:

"All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree." He cites *People* v. *Bender,* 27 Cal.2d 164, where the court said at page 183 [163 P.2d 8]:

"It is asserted that 'There is nothing in the sections of the Penal Code which relate to this subject, which indicates that the Legislature meant to assign any particular period to this process of deliberation or premeditation, in order to bring the act within the first degree.' This latter assertion is eminently correct. (See *People* v. *Thomas* (1945), *supra,* 25 Cal. 2d 880, 900 [156 P.2d 7].) But likewise there is nothing in the sections of the Penal Code which indicates that the Legislature meant to give to the words 'deliberate' and 'premeditate' any other than their common, well-known dictionary meaning.

"The adjective 'deliberate' means 'formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, esp. according to a preconceived design; . . . Given to weighing facts and arguments

with a view to a choice or decision; careful in considering the consequences of a step; . . . unhurried; . . . Characterized by reflection; dispassionate; not rash.' (Webster's New Int. Dict. (2d ed.).) The word is an antonym of 'Hasty, impetuous, rash, impulsive.' (*Id.*) It has been judicially declared that 'Deliberation means careful consideration and examination of the reasons for and against a choice or measure.' (*People* v. *Richards* (1905), 1 Cal.App. 566, 571 [82 P. 691].) The verb 'premeditate' means 'To think on, and revolve in the mind, beforehand; to contrive and design previously.' (Webster's New Int. Dict. (2d ed.).)''

Appellant argues that the evidence establishes that appellant was grieving over his broken home and the fact that his daughter told him over the telephone that she preferred the man her mother was going out with to him, and that he fired the fatal shots in a sudden transport of passion, excited by what his wife said to him as he sat talking with her in the parking area of the drive-in restaurant where she worked. Appellant asserts that the only evidence from which the court could infer deliberation was essentially circumstantial and is as consistent with the contention of appellant that the killing was the result of passion and severe emotional strain, negativing deliberation, as it was with any theory that appellant deliberated upon the slaying.

While there is some force in appellant's argument, yet it is clear that the conclusion of appellant that there was no deliberation or premeditation is not the only logical conclusion that can be drawn from the evidence. Viewing the evidence in the light most favorable to respondent, the evidence indicates that the defendant harbored considerable animosity and resentment against his wife for some time. By his own admission the intention to kill his wife was formed just after his telephone conversation with his daughter. Furthermore, during his statement to the sheriff's office shortly after the crime, which was introduced into evidence, the defendant admitted that he obtained the rifle that evening and drove to the drive-in for the purpose of killing his wife. He remained seated in his parked car for 15 minutes or so before speaking to his wife. According to his own statement he had ''cooled down'' during the brief conversation with the decedent which ensued. These facts negate a killing done hastily and rashly in the heat of sudden provocation and support a conclusion that it was a murder executed after considerable reflection.

268

■ Proof of deliberation, premediation, willfulness and malice may be inferred from the facts and circumstances surrounding the offense which furnish a reasonable ground for such conclusion. (*People* v. *Caritativo,* 46 Cal.2d 68, 72 [292 P.2d 513] ; *People* v. *Byrd,* 42 Cal.2d 200, 213 [266 P.2d 505] ; *People* v. *Eggers,* 30 Cal.2d 676, 685 [185 P.2d 1].) From the foregoing résumé of the facts of the instant case it is evident that the trial court could properly determine that the slaying was the willful and malicious product of premeditation and deliberation. (*People* v. *Caldwell,* 43 Cal.2d 864 [279 P.2d 539] ; *People* v. *Byrd, supra*; *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911] ; *People* v. *Webb,* 143 Cal.App. 2d 402 [300 P.2d 100] ; *People* v. *Pope,* 130 Cal.App.2d 321 [279 P.2d 108].)

. Murder is the unlawful killing of a human being, with malice aforethought. (Pen. Code, § 187.) All murder which is willful, deliberate and premeditated is murder of the first degree. (Pen. Code, § 189.) The evidence as indicated provides strong support for the inference that the slaying in this case was a killing with malice aforethought as a result of premeditation and deliberation. (*People* v. *Sutic,* 41 Cal.2d 483 [261 P.2d 241] ; *People* v. *Daugherty, supra*; *People* v. *Webb, supra*; *People* v. *Pope, supra.*)

■ While this court, upon appeal, has authority under sections 1181 and 1260 of the Penal Code to modify a judgment of murder of the first degree by reducing the degree of the crime to murder of the second degree, yet this authority should only be exercised where the evidence fails to support a judgment of murder of the first degree.

We think it is clear that in the instant case the question of whether or not there was a deliberate and premeditated killing was one for the trial court to decide, and that the evidence was sufficient to support the determination of the trial court that it was such a killing.

■ Here, the evidence indicates that the intent to kill his wife was formulated by the appellant during and immediately after his telephone conversation with his daughter. The trial court sitting as the trier of fact could validly infer this from the threats made by the appellant during that conversation and from his admissions after being arrested. Furthermore, his conduct supports the conclusion since it can be readily inferred that he was acting in line with this intent to kill when he obtained a rifle from his home and took it with him to the drive-in where his wife worked.

Appellant concedes that malice may be inferred from proof of the commission of a homicide by the accused, but argues that deliberation and premeditation may not be inferred from the existence of malice. He further argues that proof of an opportunity to deliberate is not proof of deliberation. However, here deliberation and premeditation are not based merely upon proof that the defendant committed a homicide. Rather, the existence of these elements is logically derived by inference from defendant's words and conduct prior to. the shooting. The evidence goes far beyond merely showing an opportunity to deliberate. The circumstances indicate that defendant did in fact premeditate and deliberate.

The judgment is affirmed.

Van Dyke, P. J., and Peek, J., concurred.